**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| SARAH BYWATER, | CASE NO. 5:25-CV-02170-SL |
| Plaintiff, | JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Sarah Bywater challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated July 24, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision denying DIB and SSI.

### PROCEDURAL BACKGROUND

On December 19, 2022, Ms. Bywater applied for DIB and SSI, alleging disability as of March 19, 2022 due to fibromyalgia, optic migraines, bilateral carpal tunnel syndrome, asthma, back problems, arthritis, irritable bowel syndrome, gastroesophageal reflux disease, anxiety, depression, allergies, sleep apnea, eczema, psoriasis, anemia, ear problems, plantar fasciitis, Achilles tendinitis, and right knee problems. (Tr. 735). After her claims were denied initially and on

1

reconsideration, Ms. Bywater requested a hearing before an administrative law judge. (Tr. 336, 348, 360, 372, 400). On September 25, 2024, Ms. Bywater (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 291-323). On October 15, 2024, the ALJ determined Ms. Bywater was not disabled. (Tr. 273-84). On August 13, 2025, the Appeals Council denied Ms. Bywater's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4; *see also* 20 C.F.R. §§ 404.981, 416.1481). Ms. Bywater timely filed this action on October 9, 2025. (ECF #1).

### FACTUAL BACKGROUND

### I.  Personal and Vocational Evidence

Ms. Bywater was 35 years old on the application date and 37 years old at the hearing. (*See* Tr. 337, 293). She graduated high school and previously worked as a pharmacy technician. (Tr. 297-98, 321). The date she was last insured under DIB was September 30, 2025. (Tr. 337).

### II.  Relevant Medical Evidence[1]

Ms. Bywater suffers chronic pain in her lower back, hips, and wrists caused by fibromyalgia, bilateral carpal-tunnel syndrome, lumbar sacroiliitis, and arthritis. She reported her back pain started around 2007 after she injured her back "attempting to lift a bag of salt into a customer's car when she worked for Walmart." (Tr. 1043). She also reported "a gradual onset polyarthralgia" since 2016 and her "[s]ymptoms have gradually progressed." (Tr. 1032).

Around when Ms. Bywater claimed she became disabled in March 2022, her insurance denied her a spine MRI because she had not completed a course of physical therapy in the

---

[1]  Although Ms. Bywater has mental health diagnoses (*see* Tr. 339-40), her arguments challenge the ALJ's analysis of her mobility limitations, pain, and migraines (*see* ECF #9 at PageID 2216-26). I thus summarize the medical record only as it concerns those limitations.

2

previous six months. (Tr. 805-06). In April 2022, Ms. Bywater underwent an initial evaluation for physical therapy to treat her lower-back pain. (Tr. 779). A physical examination revealed a mildly antalgic gait "with slow cadence," pain on palpation, increased pain in the right gluteal region, decreased range of motion, and pain with forward flexion and right-side bending. (Tr. 780). She began twice-weekly physical therapy sessions for four weeks. (Tr. 781). She completed those sessions by May 2022 with minimal improvement. (Tr. 765, 752). After completing physical therapy, an MRI revealed "[m]ild stenosis at L4-L5 secondary to disc, facet and ligamentum flavum pathology superimposed on a narrow canal" and "[m]ilder degenerative changes at the remaining levels, without stenosis." (Tr. 713).

In October 2022, Ms. Bywater attended a regular wellness exam where she complained of chronic back pain. (Tr. 713, 716). She had been referred to a spine specialist, but they refused her insurance, so she sought a new referral. (*Id.*).

In November 2022, Ms. Bywater established care with a rheumatologist and complained of constant, dull, aching, throbbing, and sharp pain; afternoon fatigue; joint pain and swelling; and morning stiffness. (Tr. 1031-32). A physical examination found "bilateral symmetric small and large joint tenderness with positive tender points." (Tr. 1035). Her rheumatologist suspected "a combination of degenerative arthritis and fibromyalgia syndrome." (Tr. 1036).

Ms. Bywater also established spinal care that month and made similar complaints of pain. (*See* Tr. 1039-40). A physical examination found tenderness in her lumbar spine and sacroiliac joints as well as positive findings on several sacroiliac diagnostic tests. (Tr. 1045). For her legs, she had 5/5 strength, intact sensation, and an antalgic gait. (*Id.*). She was assessed with lumbar

3

radiculopathy and likely sacroiliitis. (Tr. 1042). The provider prescribed gabapentin and Robaxin for pain, recommended a spinal injection, and ordered a cane.[2] (Tr. 1042-43).

Ms. Bywater received the recommended lumbar epidural steroid injection in January 2023. (Tr. 1023-24). Two weeks after the procedure, Ms. Bywater reported no relief from the injection, even in the hours immediately following the procedure, and claimed the injection worsened her pain. (Tr. 1054). A physical examination found similar findings as the November examination. (*Compare* Tr. 1058 *with* Tr. 1045). The provider suspected, "based on her symptoms and exam," "her pain is likely stemming from a sacroiliitis." (Tr. 1054). The provider referred her for bilateral sacroiliac joint injections and increased her gabapentin dosage. (*Id.*).

Ms. Bywater received the sacroiliac joint injections in March 2023. (Tr. 1028-29). She followed up in April 2023 and reported "around 60-70% relief from her symptoms" for a week, but her "symptoms slowly returned." (Tr. 1063). She complained her lower-back pain radiated into her right hip and groin, bringing tingling and numbness. (*Id.*). A physical examination found tenderness to palpation, full arm and leg strength, intact sensation, and an antalgic gait. (Tr. 1067). Ms. Bywater did not meet the requirements for a surgical evaluation, so she was referred "to IVPM [Interventional Pain Management Clinic] for full eval[uation] and treat[ment]" and "to sports medicine for a possible bursa injection." (Tr. 1063). The provider informed Ms. Bywater he "would be willing to order the walker, shower chair, and bedside commode" but could not provide

---

[2] Gabapentin is an anticonvulsant that also treats pain by changing how the body senses pain. *See Gabapentin*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a694007.html (last accessed July 22, 2026). Robaxin is a brand name for methocarbamol, a muscle relaxant also used to relieve pain. *See Methocarbamol*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682579.html (last accessed July 22, 2026).

a handicap placard. (*Id.*). Those items were ordered. (Tr. 1062). Her gabapentin dosage was increased again. (Tr. 1063).

In May 2023, Ms. Bywater was evaluated by sports medicine for hip pain. (Tr. 1069). She reported pain starting in her back that radiated to her buttocks and thighs with occasional shooting pain, numbness, and tingling that is worsened by walking, standing, and sitting. (Tr. 1070-71). A physical examination found an antalgic gait, she used a cane to ambulate, and had decreased hip range of motion and decreased hip and muscle strength. (Tr. 1073). She was diagnosed with greater trochanteric pain syndrome of both legs, bilateral sacroiliitis, and chronic bilateral low-back pain. (Tr. 1069). She underwent "ultrasound-guided bilateral greater trochanter/sub-gluteal bursa corticosteroid injections." (Tr. 1070, 1074-76). She also received over-the-counter pain relievers, a home-exercise plan, and a referral to neurosurgery to evaluate whether her pain came from her back or hip. (Tr. 1070).

In June 2023, Ms. Bywater attended a pain-management appointment. (Tr. 1077, 1102). She reported pain in her lower-back, buttocks, and legs that worsened with most movements, including walking, standing, sitting, lying down, turning, twisting, and changing position. (Tr. 1077, 1080). The pain in her legs also caused numbness and tingling. (Tr. 1077). A physical examination found tenderness to palpation of the paraspinal muscles, 5/5 muscle strength, and intact sensation. (Tr. 1088-89). She used a wheeled walker due to balance issues. (Tr. 1080). Her doctors concluded she exhibits "evidence of lumbar spondylosis." (Tr. 1090). They recommended two rounds of medial branch blocks and, if they were successful, radiofrequency ablation. (*Id.*). Ms. Bywater also saw her rheumatologist in June 2023 and reported her joint pain was constant and rated it at 8/10. (Tr. 1104).

In July 2023, Ms. Bywater underwent medial branch blocks of both her L4-L5 and L5-S1 facet joints. (Tr. 1720-21).

In September 2023, Ms. Bywater returned to her rheumatologist and again reported pain "all over" with a rating of 7/10 as well as fatigue, joint pain and swelling, and morning stiffness. (Tr. 1723-24). A physical examination found "bilateral symmetric small and large joint tenderness with positive tender points." (Tr. 1725). Her rheumatologist concluded Ms. Bywater "meets the 2016 fibromyalgia diagnostic criteria, widespread pain index (WPI) score is 19/19 and symptom severity (SS) score is 11/12, she has 5/5 body regions involved and symptom duration is more than 3 months." (Tr. 1728). She was re-prescribed hydroxychloroquine after reporting she was feeling worse without it. (Tr. 1727-28).

In October 2023, Ms. Bywater followed up with her pain-management provider and reported no benefit from the medial branch blocks. (Tr. 1729). She complained of lower-back pain radiating to her legs and feet that was constant and aching with some sharp, stabbing pain and leg numbness. (*Id.*). A physical examination found diffuse tenderness and decreased range of motion in her lower lumbar region. (Tr. 1736). She was referred to a larger pain clinic. (Tr. 1737).

Ms. Bywater followed up with her rheumatologist in January 2024 and, even though hydroxychloroquine reduced the severity of her pain, she again reported general pain rated at a 7/10, joint pain and stiffness, muscle pain, headaches, and dizziness. (Tr. 1738-39).

In April 2024, Ms. Bywater established care at a new spine and pain clinic. (Tr. 1651-58). A physical examination found a normal gait, full but painful range of motion, 5/5 muscle strength, diminished sensation to light touch in her legs, decreased reflexes, and pain to palpation throughout the lumbar and gluteus regions. (Tr. 1656-57). Ms. Bywater reportedly "responded

6

well" to a lumbar epidural steroid injection so her pain-management provider recommended a new course as well as trigger-point injections for her inflammation. (Tr. 1657). Her provider also recommended a TENS unit.[3] (*Id.*).

In May 2024, Ms. Bywater had a neurological evaluation for her back pain. (Tr. 1904). A physical examination found she used a walker and exhibited diffuse tenderness to palpation. (Tr. 1909). She was referred to pain psychology and instructed to follow up as instructed with her other care providers. (*Id.*). Later in May, Ms. Bywater underwent another round of epidural steroid injections to her lumbar spine. (Tr. 1900, 1903). A few days later, she reported doing well with no questions or concerns. (Tr. 1897-98).

In August 2024, Ms. Bywater returned to her rheumatologist. (Tr. 2038-41). She again complained of general pain, joint pain and swelling, and morning stiffness. (Tr. 2038). Her rheumatologist considered a more aggressive therapy but wanted to check her liver status first. (Tr. 2041). She reported her pain-management provider switched her from gabapentin to Lyrica and that had helped her back pain "a little."[4] (*Id.*). Also in August 2024, Ms. Bywater received bilateral hip injections. (Tr. 2142-43).

In multiple pulmonology appointments for her asthma, Ms. Bywater complained of chronic back pain and fibromyalgia. (Tr. 668, 653). But physical examinations taken during those

---

[3] Transcutaneous electrical nerve stimulation (TENS) involves using low-voltage electrical currents to relieve pain. A TENS unit is a small device that delivers the current at or near nerves to block or change the perception of pain. *See Transcutaneous electrical nerve stimulation (TENS), Cleveland Clinic,* http://my.clevelandclinic.org/health/treatments/15840-transcutaneous-electrical-nerve-stimulation-tens (last accessed July 22, 2026).

[4] Lyrica is a brand name for pregabalin, an anticonvulsant prescribed to relieve neuropathic pain. *See Lyrica, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a605045.html (last accessed July 22, 2026).

7

appointments often revealed normal range of motion and intact gait. (*See* Tr. 690, 662, 682, 1672-73) (ordered chronologically).

Ms. Bywater has suffered chronic migraines since at least age 15 for which she has received regular treatment. (Tr. 743, 769, 1206, 1619, 1674). In May 2022, she reported around 5 ocular migraines in a month and up to 20 regular migraines in a month. (Tr. 769). Her ocular migraines involve fuzzy vision, dimmed eyesight, pin-point vision, trouble focusing, and nausea and headache for the rest of the day. (*Id.*). Her migraines can last from 30 minutes to several hours, but never more than 12 hours. (*Id.*). She was assessed with intractable migraines without aura. (Tr. 773). She was prescribed Ubrelvy for the onset of migraines and a medication for regular maintenance, but she was allergic to it.[5] (Tr. 773, 762-63). She was switched to propranolol for regular maintenance.[6] (Tr. 748; *see also* Tr. 1910). She was also recommended to stop taking over-the-counter pain relievers as overuse can cause rebound headaches. (Tr. 773).

In February 2023, Ms. Bywater reported daily headaches despite taking propranolol, 8 to 12 migraines a month, and sometimes an ocular migraine. (Tr. 1206). When she can take Ubrelvy in time, the migraine becomes a "more manageable" headache. (*Id.*). Her propranolol dosage was increased. (Tr. 1210). By August, she reported having "issues with daily headaches, but not migraines," no medication side effects, and stopped taking over-the-counter pain relievers. (Tr.

---

[5] Topamax is a brand name for topiramate, an anticonvulsant used to prevent migraine headaches but does not treat the symptoms of one. *See Topiramate*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a697012.html (last accessed July 22, 2026). Ubrelvy is a brand name for ubrogeprant, a medication used to treat the symptoms of migraine headaches, though it does not prevent them. *See Ubrogeprant*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a620016.html (last accessed July 22, 2026).

[6] Propranolol is a beta blocker that relaxes blood vessels and is used to treat a variety of conditions including migraine headaches. *See Propranolol*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682607.html (last accessed July 22, 2026).

1619). She reported taking Ubrelvy for breakthrough headaches at most twice a week. (*Id.*). Later, in February 2024, her neurologist summarized: "She is still getting the occasional migraine, but they have improved a lot." (Tr. 1674).

Ms. Bywater also reported balance issues and random dizziness to her neurologist in August 2023 and February 2024. (Tr. 1619, 1674). Her neurologist initially concluded in August her balance issues were non-neurological but ordered a brain MRI. (Tr. 1624). She underwent the brain MRI in August 2024 and it demonstrated "no gross abnormality" and was "normal." (*See* Tr. 1678). In February, she was referred for a second neurological opinion. (*Id.*).

In May 2024, Ms. Bywater was evaluated for a movement disorder where she complained of daily lower-back pain, headaches that became migraines, and long-term balance issues. (Tr. 1910). She reported propranolol and Ubrelvy were helpful with controlling headaches, but gabapentin only minimally controlled her back pain. (*Id.*). A physical examination revealed an antalgic gait with multifocal chronic pain but no movement-disorder findings. (Tr. 1913).

Ms. Bywater was evaluated virtually in June 2024. (Tr. 2046). There, she reported she used to have daily migraines, but since starting her increased dose of propranolol, the frequency of migraines and headaches lowered to 12 each per month, leaving 6 days a month headache free. (Tr. 2046-47). While a neurological examination was limited by telemedicine, it was "essentially normal," and the August MRI was "unremarkable." (Tr. 2056). The provider prescribed Aimovig as an additional preventative medication, continued her other medications, and advised on lifestyle modifications.[7] (*Id.*).

---

[7] Aimovig is the brand name for ernumab-aooe, a monoclonal antibody injection medication prescribed to prevent migraines. *See Erenumab-aooe Injection*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a618029.html (last accessed July 22, 2026).

### III.    Relevant Opinion Evidence

On March 8, 2023, state agency medical consultant Mehr Siddiqui, M.D., reviewed Ms. Bywater's file and opined she could lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk, or sit for 6 hours each in an 8-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; frequently handle and finger with her right hand; and must avoid all exposure to unprotected heights and pulmonary irritants. (Tr. 343-44, 355-56). On August 10, 2023, state agency medical consultant Maria Congbalay, M.D., reviewed updated medical records and affirmed Dr. Siddiqui's findings. (Tr. 367-68, 379-80).

On May 9, 2023, state agency psychological consultant David Biscardi, Ph.D., reviewed Ms. Bywater's file and opined she was not significantly limited in understanding and memory or sustaining concentration and persistence but was moderately limited in interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in the work setting. (Tr. 344-46, 356-58). Dr. Biscardi explained Ms. Bywater "retains the capacity to understand, remember, carry out and sustain performance of competitive work activities and complete a normal workday, interact briefly/superficially with coworkers/supervisors with limited public contact, and adapt to changes/stressors associated with simple routine competitive work activities." (Tr. 345, 357). On reconsideration review in August 2023, state agency psychological consultant David Dietz, Ph.D., opined Ms. Bywater had no limitations in understanding and memory or sustaining concentration and persistence and otherwise affirmed Dr. Biscardi's findings. (Tr. 369, 381)

On April 13, 2023, Ms. Bywater was psychologically evaluated via videoconference by Stephen Billmann, Psy.D., in connection with her disability application. (Tr. 1015-20). Dr. Billmann diagnosed Ms. Bywater with generalized anxiety disorder with associated panic attacks. (Tr. 1018). Dr. Billmann opined Ms. Bywater faces "significant limitations" in her ability to respond appropriately to supervisors and coworkers in a work setting and to work pressures due to her depression and anxiety. (Tr. 1019). Dr. Billman also determined "no limitations are expected" in Ms. Bywater's ability to understand, remember, and carry out instructions or to maintain attention, concentration, persistence, and pace to perform tasks. (*Id.*).

## IV. Relevant Testimonial Evidence

Ms. Bywater explained she stopped working as a pharmacy technician in March 2020 during the COVID-19 pandemic because the cleaning solution used to clean the pharmacy every 10 minutes would trigger her asthma so severely that she coughed up blood. (Tr. 299). Since March 2020, her back problems and fibromyalgia had worsened such that she could not stand for long periods while fluorescent lights and computers caused migraines. (*Id.*).

The severity of Ms. Bywater's back pain varies based on her activity level. (Tr. 300). It is worsened when she is standing, walking distances, and sitting. (Tr. 300). She can stand for about 10 minutes and sit for about 15 minutes before it becomes painful. (Tr. 309). At most, she can bend three times in a day, after which her back "goes out" and she struggles to stand straight. (Tr. 300). Physical activity also worsens her asthma and causes wheezing and shortness of breath. (Tr. 313). To treat her pain, she is prescribed muscle relaxers and pain medication, physical therapy, and spinal injections but has not had back surgery. (Tr. 300-01, 302, 314-15). To relieve pain, she sits in a recliner or on her bed with her feet raised. (Tr. 300, 311). While riding in a car, she takes a muscle relaxant, brings a pillow for her back, and turns on the seat heater. (Tr. 315). She also

11

uses a TENS unit, ice packs, and heating pads to alleviate pain. (Tr. 311). She uses her TENS unit four or more times a day for an hour or two each time. (*Id.*).

Ms. Bywater is also diagnosed with fibromyalgia. (Tr. 301). It causes her pain "everywhere" that varies in intensity and triggers based on the day. (*Id.*). On bad days, her fibromyalgia pain is triggered by clothing or touch to her skin. (*Id.*). She is prescribed medication, though the type of medication available to her is limited by her fatty-liver disease. (Tr. 301-02).

Ms. Bywater suffers migraines about three to four times a week. (Tr. 302). Her migraines vary in duration: an optic migraine can blind her for a half an hour while a "little migraine" can last for an hour. (*Id.*). She has had one migraine last up to three days. (Tr. 302). She had a migraine the morning of the administrative hearing that lasted two hours. (Tr. 302-03). To treat it, she took a pill and rested in a quiet dark room. (Tr. 303). She has both a regular maintenance medication and a medication for the onset of migraines. (*Id.*).

Ms. Bywater lives with her mother. (Tr. 296-97). She and her mother take turns with chores, though her mother will help her with cooking. (Tr. 306). On the day before the administrative hearing, Ms. Bywater got up, took her medicine, and then had to sit down for a few hours because of morning stiffness and her feet felt "like they're breaking." (Tr. 305). She then did some minor cleaning, folded laundry, made a salad, cooked spaghetti, and ate dinner. (*Id.*). After each task, she had to sit down to relieve pain and to rest. (*Id.*; *see also* Tr. 313). She also has a chair in the kitchen to sit on while cooking. (Tr. 305-06). She likes to sew and will craft for a couple of hours a week on recommendation from her psychologist. (Tr. 315-16, 317). She cannot sit for long to craft and sewing aggravates her bilateral carpal-tunnel syndrome. (Tr. 317). Both she and her

mother craft and she will occasionally go with her mother to a craft fair to sell things her mother made. (Tr. 316). She does not craft anything for sale. (*Id.*).

Ms. Bywater uses a cane and a walker. (Tr. 307). She began with a cane in 2022 and was "switched" to the walker in 2023 after she suffered random falls. (Tr. 307-08). Her cane takes the pressure off her lower back while walking. (Tr. 308). She uses the cane all the time to get around her home as her walker does not fit in the hallways or between furniture well. (Tr. 307). She uses her walker when she has to walk around, go to the doctor's office, or traverse wide-open spaces. (Tr. 307). She uses an electric scooter when she travels short distances or goes grocery shopping because she cannot walk the whole store. (Tr. 306, 307).

### STANDARD FOR DISABILITY

Eligibility for benefits turns on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine whether a claimant is disabled:

1.   Was claimant engaged in a substantial gainful activity?

2.   Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3.   Does the severe impairment meet one of the listed impairments?

4.   What is claimant's residual functional capacity and can claimant perform past relevant work?

13

5.     Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Bywater had not worked since the date she claimed her disability began. (Tr. 276). At Step Two, the ALJ identified "lumbar degenerative disc disease, anxiety disorder, obesity, carpal tunnel syndrome, asthma, osteoarthritis, fibromyalgia, and depressive disorder" as severe impairments. (*Id.*). At Step Three, the ALJ found Ms. Bywater's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 276-78).

At Step Four, the ALJ determined Ms. Bywater's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except she can never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. She can never work at unprotected heights, never work around moving mechanical parts, and never operate a motor vehicle. She can have frequent exposure to dust, odors, fumes, and pulmonary irritants. The claimant is limited to simple instructions and work-related decisions with no production rate pace. She can have

> occasional interactions with others. She can handle occasional changes in a routine work setting. She requires a cane for ambulation.

(Tr. 278) (cleaned up). The ALJ concluded Ms. Bywater could not perform her past relevant work as a pharmacy technician. (Tr. 282). At Step Five, the ALJ determined Ms. Bywater could perform other work in the national economy, including as a weight tester, ticket checker, and final assembler. (Tr. 283). Thus, the ALJ concluded Ms. Bywater was not disabled. (*Id.*).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if

substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Ms. Bywater argues the ALJ erred in finding her wheeled walker was not medically necessary, improperly evaluated her statements about her symptoms, and erred in finding her migraines were not a severe impairment at Step Two of the sequential evaluation. (ECF #9 at

16

PageID 2216, 2219, 2223-34). Following the sequence of the ALJ's evaluation, I begin with Ms. Bywater's alleged Step-Two error.

## I.        Migraines as a severe impairment

Ms. Bywater argues the ALJ erred at Step Two in finding her migraines to be a non-severe impairment and did not consider when crafting the RFC how her migraines affected her ability to stay on task or caused absenteeism. (ECF #9 at PageID 2224-26). The Commissioner counters that any error in finding Ms. Bywater's migraines to be non-severe was harmless because in crafting the RFC the ALJ considered the functional impact of her migraines. (ECF #10 at PageID 2231-32).

At Step Two, the ALJ determines whether the claimant has a medically determinable impairment, or a combination of impairments, that is "severe," meaning one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). The Sixth Circuit has construed Step Two as a *de minimis* hurdle, explaining that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988) (citations omitted). "The goal of the test is to 'screen out totally groundless claims.'" *Anthony v. Astrue*, 266 F.App'x 451, 457 (6th Cir. 2008) (quoting *Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)). Because a claimant clears Step Two with at least one severe impairment and an ALJ must consider the combination of all severe and non-severe impairments when crafting the RFC at Step Four, an ALJ's failure to find an impairment severe is harmless when other impairments are found severe. *See Anthony v. Astrue*, 266 F.App'x 451, 457 (6th Cir. 2008); *see also* 20 C.F.R. §§ 404.1545(e), 416.945(e) (each requiring an ALJ "consider the limiting effects of all your impairment(s), even those that are not severe, in

17

determining your residual functional capacity."); Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *5 (July 2, 1996) (requiring the ALJ "consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'").

To be sure, the ALJ did not find Ms. Bywater's migraines to be a severe impairment. (*See* Tr. 276). The ALJ identified Ms. Bywater has having multiple other severe impairments: "lumbar degenerative disc disease, anxiety disorder, obesity, carpal tunnel syndrome, asthma, osteoarthritis, fibromyalgia, and depressive disorder." (Tr. 276). She thus "cleared step two of the analysis." *Anthony*, 266 F.App'x at 457. Accordingly, any error in mis-classifying Ms. Bywater's migraines as non-severe is harmless so long as the ALJ considered both the severe and non-severe impairments when crafting the RFC. *See id.*; *see also Vidot v. Colvin*, No. 1:14-cv-1343, 2015 WL 3824360, at *2 (N.D. Ohio June 18, 2015) ("[A]ny failure on the part of the ALJ at step two to consider [the claimant]'s migraine headaches to be a severe impairment is 'legally irrelevant' because the ALJ found that [the claimant] suffers from other severe impairments.").

The ALJ considered the impact of Ms. Bywater's migraines in the RFC, mentioning them three times at Step Four. First, the ALJ listed migraines among Ms. Bywater's conditions for which she claims disability. (Tr. 279). Second, the ALJ found "[t]he record reflects that the claimant had a history of several conditions predating the alleged onset date in March 2022, including anxiety, depression, asthma, migraines, and obesity." (Tr. 279) (citation omitted). Third, the ALJ noted "[t]he claimant also had ongoing treatment for headaches." (Tr. 280) (citation omitted). While this discussion is minimal, the ALJ discussed Ms. Bywater's migraines earlier and the court must read the decision as a whole. *See Buckhannon ex rel. J.H. v. Astrue*, 368 F.App'x 674, 678-79 (7th Cir. 2010).

18

Earlier at Step Two, ALJ addressed that Ms. Bywater's migraines were factored into the RFC:

> The record shows that the claimant has been diagnosed with . . . migraines . . . . However, the evidence indicates that these conditions impose only minimal limitations on the claimant's ability to perform basic work activities. Therefore, they are non-severe impairments. Nevertheless, despite the non-severe finding, any limitations caused by such impairments are incorporated in the residual functional capacity set forth below.

(Tr. 276). The ALJ also incorporated the analysis of Ms. Bywater's migraines at Step Three into the RFC:

> I also considered the claimant's . . . headaches under [Social Security Ruling] 19-4p, and her obesity consistent with [Social Security Ruling (SSR)] 19-2p. The evidence did not document any symptoms of such condition that would meet any listing. Nevertheless, I evaluated the claimant's conditions consistent with the SSRs and included associated limitations in the residual functional capacity.

(Tr. 277). True this discussion is minimal, but the mention of migraines at Steps Two, Three, and Four suggests the ALJ did what the ALJ said and "consider[ed] [the claimant]'s migraines." *Vidot*, 2015 WL 3824360, at \*2.

Ms. Bywater contends the ALJ should have expressly considered how her migraines affected her ability to stay on-task or cause absences from work. (ECF #9 at PageID 2225-26). She cites many treatment records documenting her migraines and treatment. (*Id.*). Even so, the existence of migraines does not by itself require specific limitations for being off-task or missing work. *See Campbell v. Colvin*, No. 5:14-cv-526, 2015 WL 631191, at \*19 (N.D. Ohio Feb. 12, 2015) (rejecting argument that the RFC must reflect the "common sense that migraine headaches cause individuals to be either off-task or miss work" even when migraines are found a severe impairment). The opinion evidence did not assess any limitations from migraines. The state agency reviewers considered Ms. Bywater's allegation of migraines and treatment notes for them. (*See* Tr.

19

338, 350, 362-63, 374-75). The reviewing psychologists opined Ms. Bywater is either not significantly limited in understanding and memory or sustaining concentration and persistence or not limited in those areas. (*See* Tr. 344-46, 356-58, 369, 381). While Dr. Billmann did not assess Ms. Bywater specifically for migraines, they were mentioned in the interview and he did not opine that Ms. Bywater had any limitations in maintaining attention, concentration, persistence, or pace. (Tr. 1016, 1019). No reviewer commented on absenteeism.

The ALJ though went beyond the opinion evidence by including in the RFC a limitation to not work at a production-rate pace. (Tr. 278). Though it does not directly impose an amount of time off-task, other courts have found that limiting a person's pace of work can accommodate difficulty staying on task. *See Dunn v. Saul*, No. 19-cv-13133, 2020 WL 7700614, at *9 (E.D. Mich. Nov. 30, 2020) (finding the claimant's concentration limitations were addressed by "the preclusion of production-rate pace/assembly line work"), *report and recommendation adopted*, 2020 WL 7695900 (E.D. Mich. Dec. 28, 2020). By including in the RFC concentration limitations greater than the medical sources opined suggests the ALJ accounted for Ms. Bywater's migraines and their resulting limitations.

Because the ALJ considered the effects of Ms. Bywater's migraines at Step Four, any error in classifying them as a non-severe impairment at Step Two would be harmless. I thus decline to recommend remand on this issue.

## II.      Whether the wheeled walker was medically necessary

Ms. Bywater argues substantial evidence does not support the ALJ's finding that her walker was not medically necessary because her medical providers ordered the walker and she consistently used it. (*See* ECF #9 at PageID 2216-18). The Commissioner counters that Ms. Bywater's walker use did not meet the requirements of Social Security Ruling 96-6p because the walker was

20

requested by Ms. Bywater (not prescribed by her medical provider) and the order did not describe the circumstances for which the walker was needed. (ECF #10 at PageID 2233-34).

When medically required, a hand-held assistive device like a walker must be included in the RFC. *Carreon v. Massanari*, 51 F.App'x 571, 575 (6th Cir. 2002). To be medically required, there must be "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." *See* Soc. Sec. Ruling (SSR) 96-9p, 1996 WL 374185, at *7 (July 2, 1996). A claimant's subjective desire to use a walker is not enough. *See Carreon*, 51 F.App'x at 575.

> The ALJ addressed Ms. Bywater's use of a walker while discussing her pain, finding:
>
> She had ongoing back and joint pain related to arthritis, fibromyalgia, and lumbar disc degeneration. She displayed tenderness and limited motion with an antalgic gait, leading her to use a cane. She also used a walker, but the evidence did not document that such device was deemed medically necessary. Moreover, the claimant had generally intact strength and sensation at the balance of her exams, with some periods of lost sensation. Her conditions appeared to be relatively stable with some improvement when taking medication. Likewise, her asthma was largely controlled with medication. Such facts suggest that she could perform the reduced range of sedentary work described in the residual functional capacity.

(Tr. 281-82). The ALJ did find Ms. Bywater's cane to be medically necessary and included it in the RFC. (*See* Tr. 278).

Ms. Bywater contends her walker was medically required because "[t]he medical providers in this matter ordered the walker and referred Ms. Bywater for additional evaluations to determine the cause of her balance issues." (ECF #9 at PageID 2218). To show the walker was prescribed by her doctors, Ms. Bywater points to an April 2023 treatment note that "assessed low back pain with likely sacroiliitis and bilateral trochanter pain and gave a . . . referral to sports medicine; walker,

21

beside commode, and shower chair ordered." (ECF #9 at PageID 2217 (quoting Tr. 1062); *see also* Tr. 296 (citing Tr. 1062)). She also points to her testimony that "she 'would just randomly fall' and that was why her doctor 'switched [her] to a walker.'" (*Id.*) (quoting Tr. 308). She also cites many other treatment notes documenting her use of a walker and her balance issues. (*See id.* at PageID 2217-18).

This evidence does not establish a walker was medically required under SSR 96-6p. To start, there is limited "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing." *See* SSR 96-9p, 1996 WL 374185, at *7. Ms. Bywater cites an April 2023 note to show she was prescribed the walker; it recounts a treatment plan of:

1.   Referral to IVPM for full eval and treat;
2.   Referral to sports medicine;
3.   Walker, bedside commode, and shower chair ordered;
4.   Increase gabapentin 800 mg TID. PDMP reviewed; and
5.   Follow in neurosurgery clinic as needed. Patient was educated on signs and symptoms that would warrant return sooner to clinic.

(Tr. 1062). In the treatment history, the note adds further context:

She tells me that she has had a few falls since her last appointment due to her legs giving out. She has been using a cane which was ordered at her last appointment. She requests a handicap placard, walker, toilet seat, and shower chair today.

(Tr. 1063). And the provider "informed her that I would be willing to order the walker, shower chair, and bedside commode. However, she should discuss a handicap placard with her PCP." (*Id.*). Thus, the note is not clear whether Ms. Bywater's provider concluded the walker is medically required or whether the provider simply facilitated a purchase of a walker based on Ms. Bywater's own subjective desire to use one. Looking to earlier treatment notes by the same provider about Ms. Bywater's cane is of no help. When she ordered a cane in November 2022, the treatment note recounted: "Order for cane printed out given to patient per their request." (Tr. 1042). It is unclear

22

whether Ms. Bywater requested the order or simply the printout and the note offers no further context. (*See* Tr. 1042-43). Thus, the medical documentation does not clearly establish on its own whether a walker was medically required.

Nevertheless, the ALJ seemingly resolved that ambiguity in favor of Ms. Bywater based on her statements. Ms. Bywater stated in a disability report that she was "prescribed a cane and walker." (Tr. 573). She also stated in the administrative hearing that her provider "switched [her] to a walker" from a cane because of falls. (Tr. 308). The ALJ accepted these statements, finding: "She noted that she was prescribed a cane and walker." (Tr. 279) (citing Tr. 573). But even if Ms. Bywater is correct that her provider required use of a walker to aid in walking or standing, she still has satisfied only one of the two requirements of SSR 96-6p for a device to be "medically required."

In addition to medical documentation showing the need for a hand-held assistive device to aid in walking or standing, there must also be documentation of "the circumstances for which [the walker] is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." *See* SSR 96-9p, 1996 WL 374185, at *7. The April 2023 note says nothing about the circumstances of use. (*See* Tr. 1062-63).

Ms. Bywater also cites her doctors' treatment notes, but they each suffer the same problem: documenting her use of a walker as well as her balance issues and falls but not describing the circumstances for which the walker is needed. (*See* Tr. 1172 ("comments: has wheeled walker"), 1674 ("She is currently using a walker due to her balance and to prevent her from falling"), 1909 ("using walker")). Reporting the use of a walker does not prove its use was medically required. *See Morrow v. Comm'r of Soc. Sec.*, No. 1:18-cv-403, 2019 WL 1428199, at *12 (N.D. Ohio Mar. 29,

23

2019) ("[T]he provider merely observed Morrow using a cane or walker, without imposing a requirement that he do so"). Because none of the treatment notes explain the frequency, time, situation, distance, terrain, or other circumstances for when Ms. Bywater needs a walker, they do not show the walker was medically required. *See Peters v. Comm'r of Soc. Sec.*, No. 1:24-cv-26, 2024 WL 4945007, at *10 (N.D. Ohio Dec. 3, 2024) ("The notation of a balance problem does not specify when, where, or in what terrain the walker is considered to be necessary"), *report and recommendation adopted,* 2025 WL 885682 (N.D. Ohio Mar. 21, 2025). In this situation, "multiple courts throughout this Circuit upheld ALJ decisions that did not include the need for an assistive device in a claimant's RFC." *Cantu v. Comm'r of Soc. Sec.*, No. 3:20-cv-819, 2021 WL 2156395, at *17 (N.D. Ohio May 27, 2021) (collecting cases). Thus, the medical documentation does not establish under SSR 96-6p that Ms. Bywater medically required a walker.

I thus decline to recommend remand on this basis.

### III.    Evaluation of subjective statements of symptoms

Ms. Bywater argues the ALJ erred in finding her statements only partially consistent with the evidence because the ALJ did not consider the positive physical-examination findings, treatment evaluations, and different unsuccessful treatment modalities that supported her reports of disabling lower-back pain. (ECF #9 at PageID 2220-23). The Commissioner responds the ALJ considered multiple regulatory factors—including Ms. Bywater's daily activities; the nature of her symptoms; and medication and non-medication treatment—and substantial evidence supported the ALJ's decision to limit Ms. Bywater to a highly restrictive RFC. (ECF #10 at PageID 2235-37).

In evaluating the claimant's subjective reports of symptoms, SSR 16-3p requires that the ALJ consider the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence. 2017 WL 5180304, at *5-8 (Oct. 25, 2017). The ALJ

24

also uses the factors outlined in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) to evaluate the

claimant's statements:

1.    A claimant's daily activities;

2.    The location, duration, frequency, and intensity of pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6.    Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7.    Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ must analyze factors for which there is evidence in the record but need not analyze factors

that are not relevant. SSR 16-3p, 2017 WL 5180304, at *8. The ALJ's explanation of that

assessment must be specific enough to permit the court to "trace the path" of the ALJ's reasoning.

*Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005).

The ALJ's analysis of Ms. Bywater's complaints permeated the ALJ's discussion at Step

Four. (Tr. 279-82). The ALJ made specific conclusions regarding Ms. Bywater's testimony about

her physical impairments at the end of the discussion:

> With respect to the claimant's alleged symptoms and limitations, I find such assertions only partially consistent with the evidence. She had ongoing back and joint pain related to arthritis, fibromyalgia, and lumbar disc degeneration. She displayed tenderness and limited motion with an antalgic gait, leading her to use a cane. She also used a walker, but the evidence did not document that such device was deemed medically necessary. Moreover, the claimant had generally intact strength and sensation at the balance of her exams, with some periods of lost sensation. Her conditions appeared to be relatively stable with some improvement when taking medication. Likewise, her asthma was largely controlled with medication. Such facts

25

suggest that she could perform the reduced range of sedentary work described in the residual functional capacity.

(Tr. 282). This discussion reflects the ALJ's comparison of Ms. Bywater's complaints to the medical evidence and the treatment received as instructed by SSR 16-3p and §§ 404.1529(c)(3)(v)-(vi) and 416.929(c)(3)(v)-(vi). The ALJ also mentioned Ms. Bywater's daily activities previously at Step Three when analyzing her limitations in adapting and managing herself. (*See* Tr. 277-78). The court must read the ALJ's decision as a whole and with common sense. *See Buckhannon*, 368 F.App'x at 678-79. Though Step Three and Four have different analyses, the ALJ mentioned the RFC "reflects the degree of limitation I have found in the 'paragraph B' mental function analysis." (Tr. 278). Thus, the discussion there informs the ALJ's analysis of Ms. Bywater's testimony as her daily activities are a relevant factor under both SSR 16-3p and 20 C.F.R. §§ 404.1529(c)(3)(i) and 416.929(c)(3)(i).

Ms. Bywater does not contest the ALJ's application of the regulatory factors but rather argues the ALJ's decision lacks an accurate and logical bridge from evidence to conclusion because the ALJ did not consider the other positive objective findings, the consistency of Ms. Bywater's assertions that she was suffering from low back pain, her balance difficulties, the specialist evaluations, or the different, unsuccessful treatment modalities. (*See* ECF #9 at PageID 2220-21, 2223). Actually, the ALJ's decision discusses several of the very notes Ms. Bywater claims were overlooked. Ms. Bywater claimed the ALJ ignored a November 2022 examination with positive findings. (ECF #9 at PageID 2221) (citing Tr. 1042-45). But the ALJ discussed that note, finding Ms. Bywater complained of "low back pain that radiated to her lower extremities" and "displayed lumbar spine tenderness and some reduced strength with sacroiliac maneuvers, but otherwise normal strength and sensation." (Tr. 279) (citing Tr. 1043, 1045).

26

Ms. Bywater also claims the ALJ overlooked a May 2023 examination where she "demonstrated an antalgic gait with the use of a cane, decreased hip muscle strength secondary to pain, positive Faber test," and other findings indicating pain and reduced movement. (ECF #9 at PageID 2221) (citing Tr. 1073). The ALJ discussed that examination, finding "other exams showed slightly decreased hip strength with positive Faber sign. She used a cane to ambulate." (Tr. 280) (citing Tr. 1073).

Ms. Bywater claims the ALJ overlooked a September rheumatology examination that noted findings "by Dr. Rehmann not[ing] 'bilateral symmetric and large joint tenderness with positive tender points.'" (ECF #9 at PageID 2222) (quoting Tr. 1725). The ALJ discussed that note, finding in September 2023 that "the claimant exhibited small and large joint tenderness with positive tender points but normal sensation and strength." (Tr. 280) (citing Tr. 1725). True, the ALJ did not note that Ms. Bywater's "repeat ESR [erythrocyte sedimentation rate] and CSR [c-reactive protein] are elevated again and that she met the criteria for fibromyalgia." (ECF #9 at PageID 2222) (citing Tr. 1727, 1728, 1740). Instead, the ALJ addressed those inflammatory markers generally, finding "[t]he claimant had a September exam for arthritis where she displayed elevated inflammatory markers." (Tr. 280) (citing Tr. 1724).

Ms. Bywater points to an April 15, 2024 examination as overlooked for its positive findings of "diminished sensation to light touch in the L3 bilateral lower limbs dermatomes, decreased L4 patellar reflexes, left and right and [sacroiliac joint] tenderness bilaterally and Ms. Bywater was 'very sensitive to any touch to her lower back. She had pain throughout the lumber and gluteus regions to palpation.'" (ECF #9 at PageID 2222) (quoting Tr. 1656-57). The ALJ discussed some of those very findings, noting Ms. Bywater "had decreased sensation in the L3 bilateral lower limb

27

dermatomes decreased patellar reflexes, paraspinal tenderness, and numbness in her foot, but normal strength and gait." (Tr. 280) (citing Tr. 1656) (cleaned up).

Ms. Bywater notes the ALJ did not discuss a May 7, 2024 evaluation for a movement disorder. (ECF #9 at PageID 2222) (citing Tr. 1910). While the ALJ did not discuss that note, the ALJ instead discussed a different May 2024 neurological examination "in which [Ms. Bywater] complained of low back pain radiating into her legs that was aggravated by standing, sitting, and walking . . . was using a walker and she had diffuse tenderness to palpation." (Tr. 280) (citing Tr. 1903-04, 1909). Yet, Ms. Bywater claims the ALJ overlooked that very examination that "noted Ms. Bywater was using a walker and had 'diffuse tenderness to palpation.'" (ECF #9 at PageID 2222) (citing Tr. 1909).

After reviewing the ALJ's decision, Ms. Bywater is correct that the ALJ did not discuss rheumatology examinations from November 4, 2022 and January 27, 2023. But the ALJ is not required to "discuss every piece of evidence in the record for [the] decision to stand." *See Thacker v. Comm'r of Soc. Sec.*, 99 F.App'x 661, 665 (6th Cir. 2004). Though the ALJ is not required to discuss each item of evidence in the record, the ALJ must consider all the evidence in the record. *See Morway v. Comm'r of Soc. Sec.*, No. 1:22-cv-523, 2023 WL 1782234, at *8 (N.D. Ohio Feb. 1, 2023). Here, the ALJ discussed the vast majority of examination notes Ms. Bywater claims were overlooked, often making the very findings she claims should have been in the decision. The ALJ can hardly be accused of failing to build an accurate and logical bridge in the decision when the ALJ follows almost exactly the route that the claimant suggests.

Last, Ms. Bywater argues the ALJ overlooked that her back pain persisted despite various different attempts to treat it, including spine injections in January, March, and May 2023 and

28

August 2024; medial branch blocks in May, June, and July 2023; and a hip injection in August 2024. (ECF #9 at PageID 2222-23) (citing Tr. 1070-71, 1074, 1028, 1101, 1720, 1900, 2142). But this argument has the same problem: the ALJ noted many of the treatments that Ms. Bywater claims were ignored. First, the ALJ noted that "[i]n early 2023, the claimant underwent injections for her lumbar spine." (Tr. 279) (citing Tr. 1024 (January 2023), 1029 (March 2023)). Then the ALJ noted in June 2023, "[s]he received lumbar spine injections. She later underwent a diagnostic block injection." (Tr. 280) (citing Tr. 1720). The ALJ also noted that medial branch blocks were unsuccessful, finding that in October 2023, "the claimant said she had minimal benefit with diagnostic block injections and physical therapy." (Tr. 280) (citing Tr. 1729 (discussing both March 2023 spine injections and July 2023 medial branch blocks)). Then, the ALJ noted in May 2024, "[s]he was given a lumbar spine injection." (Tr. 280) (citing Tr. 1903). While true, the ALJ did not discuss the hip injection, the ALJ did find that spinal injections and medial branch blocks were unsuccessful. The ALJ cannot be criticized for ignoring the failed treatments when the ALJ discusses those very treatments. And the modality and effectiveness of treatment is a factor to consider for evaluating a claimant's statements. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv) and 416.929(c)(3)(iv).

In sum, in evaluating Ms. Bywater's statements about her symptoms, the ALJ applied multiple factors under SSR 16-3p and 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) and substantial evidence supports the ALJ's application of those factors. While Ms. Bywater criticizes the ALJ for overlooking the physical examinations indicating pain and her unsuccessful treatments, the ALJ discussed many of the examinations and treatments Ms. Bywater claims were overlooked. To the extent Ms. Bywater asserts the ALJ did not specifically address these

29

examinations and treatments in the same paragraph summarizing the ALJ's reasoning for discounting her complaints of pain, she has not shown error. The ALJ need not incorporate all information relied on into a single tidy paragraph. *See Buckhannon,* 368 F.App'x at 678-79. The ALJ noted most of the examinations and treatments for arthritis, fibromyalgia, and lumbar disc degeneration in her summary of the medical evidence. In the paragraph discounting Ms. Bywater's symptoms related to those conditions, the ALJ determined her complaints of pain were inconsistent with the record evidence. Read as a whole and with common sense, the ALJ properly considered the factors and explained his reasoning, thus building the necessary bridge between the evidence and the result.

I thus decline to recommend remand on this basis.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: July 22, 2026

_____

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

30

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

31